IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                          No. 15-cr-4409 KG

SULEMA CARBAJAL DEL REAL,

    Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Defendant Sulema Carbajal del Real's ("Defendant") Motion to Suppress Physical Evidence and Statements ("Motion") [Doc. 22], filed on January 7, 2016. Defendant moves to suppress all testimonial and physical evidence, including approximately 80 kilograms of marijuana, seized as a result of what she contends was an illegal stop and search of her vehicle by a Border Patrol Agent. *Id.*

The Government responded on January 21, 2016. [Doc. 30]. Defendant replied on January 26, 2016. [Doc. 31]. The Honorable Kenneth J. Gonzales, United States District Judge, referred the Motion to me to make findings of fact and to recommend an ultimate disposition. [Doc. 25]. I held an evidentiary hearing on February 22, 2016. United States Border Patrol agents Orlando Morin and Philip Gaylord, along with Border Patrol Law Enforcement Communications Assistant Argelia Reta, testified for the Government. Investigator Horlando Lopez testified for Defendant. Having reviewed the briefing, applicable law, and the evidence and argument presented at the hearing, and being otherwise fully advised in the premises, I find that the agent did not have the requisite reasonable suspicion to stop Defendant's car.

I recommend, therefore, that the Motion be GRANTED, and the evidence obtained from the stop be suppressed.

## FACTUAL FINDINGS

On August 31, 2015, at around 4:00 a.m., United States Border Patrol Agent Orlando Morin was observing traffic in a marked patrol vehicle at the intersection of New Mexico Highways 80 and 9. [Doc. 30] at 1. He was parked on the west side of Highway 80, facing east toward Highway 9. Hrg. Tr. at 12:10–11. His headlights were illuminated, but not his high beams. *Id*. at 47:19–23. It was otherwise completely dark at the intersection; there were no streetlights or other nearby sources of light in the area. *Id*. at 36:1–9.

Agent Morin had been a Border Patrol agent at the Lordsburg, New Mexico station for nine years. [Doc. 30] at 1. Based on that experience, he was aware that Highway 80 is often used by smugglers of illegal aliens and/or drugs in order to bypass a Border Patrol checkpoint on Interstate 10. Hrg. Tr. at 13:10–15.

The intersection of Highways 80 and 9 is about eight miles north of Rodeo, New Mexico, [Doc. 30] at 1–2, about one mile from the New Mexico-Arizona border, *see* Government Exh. 8, and about fifty miles (as the crow flies) from the U.S.-Mexico border (or about sixty miles from the origin point of Highway 80 at the U.S.-Mexico border), Hrg. Tr. at 13:2–8. Agent Morin testified that he had observed traffic at that intersection at least once or twice a week for several years. *Id*. at 16:11–16. In his experience, traffic around that time of night, if indeed there was any, consisted mainly of semi-trailer trucks. *Id*. at 14:9–13. He also testified that he thought smugglers tried to take advantage of the 4:00 a.m. "shift change" at the Lordsburg station in order to avoid detection. [Doc. 30] at 2; Hrg. Tr. at 60:9–62:12. However, testimony revealed

2

that there is no shift change at 4:00 a.m. The Lordsburg station uses staggered shifts, so that there is no time when one shift of agents is relieving another.[1] *Id*. at 105:13–108:14.

Agent Morin testified that he had twice apprehended illegal aliens travelling in older-model sedans in the previous two weeks. *Id*. at 69:7–9. Defendant presented evidence suggesting that smugglers previously arrested in the area do not tend to favor any particular time or any particular type of vehicle in which to conduct illegal activity.[2] *Id*. at 50:23–63:20.

At about 4:10 a.m., Agent Morin observed a grey sedan traveling north on Highway 80. *Id*. at 14:16; 16:22–25. The car appeared to be travelling at the posted speed limit of 60 miles per hour as it passed him. *Id*. at 45:8–18. Because of its speed, and because he was only able to see the area of the highway illuminated by his headlights, Agent Morin was able to observe the car for only .25 seconds. *Id*. at 44:17–46:2. Agent Morin testified that he could not see the driver's demeanor as she passed, but could see a female "silhouette."[3] *Id*. at 17:1–5. Because of the time of night, and because he did not recognize the car as belonging to a local resident, Agent Morin followed it and requested a records check on the license plate number. *Id*. at 17:1–11. He

---

[1] The shifts at the Lordsburg station are as follows: 12:00 p.m.–8:00 pm., 6:00 p.m.–2:00 a.m., 12:00 a.m.–8:00 a.m., and 6:00 p.m.–2:00 a.m. Hrg. Tr. at 105:13–106:2. Agents leave the field to return to the station between one to one-and-a-half hours before their shift ends. *Id*. at 89:6–11. Agents also sometimes work overtime, adding up to two hours to the end of their assigned shift. *Id*. at 107:19–108:12.

[2] Defendant presented criminal complaints of alien and drug smuggling from July and August 2015 in the "boot heel" region of New Mexico. *See* Defendant's Exh. D–K. These complaints involve a diverse selection of types and ages of vehicles (2005 Jeep Grand Cherokee, 2002 Ford Taurus, 1997 Dodge Ram, 2003 Ford Windstar, Ford Mercury, 1997 Chevrolet Blazer, 2012 Mazda sedan, white sedan), with arrests occurring at all hours of the day and night (5:45 p.m., 12:05 p.m., 6:15 a.m., 7:00 a.m., 1:20 a.m., 5:15 a.m., 1:30 a.m.). It is not entirely clear what criteria Defendant used to select these complaints, nor is it clear that these complaints are representative of all of the smugglings arrests in the boot heel region. It is undeniable, however, that smugglers use a variety of vehicles and times of day to conduct criminal activity.

[3] In its Response, the Government had represented that the lone female driver appeared rigid and did not turn to look at Agent Morin as she passed, instead keeping her eyes on the road. [Doc. 30] at 3. However, Agent Morin directly repudiated this during direct examination when he stated that he could not see her demeanor as she drove past. Hrg. Tr. at 17:1–5.

learned that the vehicle was a 2002 Honda Civic registered to Sulema del Real of Mesa, Arizona. *Id*. at 18:6–10.  Agent Morin was aware that some smugglers originate in the "Mesa, Phoenix area." *Id*. at 19:1–10.

Agent Morin followed the vehicle on Highway 80 for about fourteen miles.  Hrg. Tr. at 66:21–67:1.  He stayed approximately four car lengths behind the vehicle, travelling about 60 miles per hour.  *Id*. at 64:25–65:3.  He was eventually joined by another Border Patrol agent, Philip Gaylord, who had driven towards Morin's position after hearing the results of the records check over the radio.  *Id*. at 93:9–11.  Agent Morin testified that he observed the driver repeatedly looking in her rearview mirror.  Although it was pitch-black at the time, and there were no street lights, he testified that light from the "reflectors" on the curves of the road provided sufficient light for him to see the driver checking her mirror.  *Id*. at 22:8–11; 65:24–66:7.

Agent Morin testified that after following Defendant for 10–14 minutes, he observed her swerve to the left a few times.  *Id*. at 22:7–11.  She did not accelerate, decelerate, or take any other irregular action.  Based on his observations, Agent Morin decided to conduct an "immigration inspection" of Defendant. [Doc. 30] at 3–4.

After initiating the stop, Agent Morin spoke to Defendant and eventually received her permission to first search her trunk, and then to search her entire vehicle. *Id*. at 5–6; Hrg. Tr. at 25:18–26:1; 29:2–13.  He found two bundles wrapped in brown packing tape. [Doc. 30] at 6. Testing revealed that the bundles contained approximately 80 kilograms of marijuana. *Id*. at 7. Defendant was placed under arrest and later spoke to agents about the details of her transportation of the drugs.  *Id*.  Defendant challenges both the initial stop and continued

detention as unconstitutional. She moves to suppress all evidence, physical and testimonial, recovered a result of the stop and detention. [Doc. 22] at 1.

## DISCUSSION

After a detailed review of the totality of the circumstances, the Court finds that Agent Morin did not have the reasonable suspicion required to initiate the stop. While the Court is mindful that the area where the stop occurred was known to the agent as a route used by smugglers, that by itself is not enough to establish reasonable suspicion of illegal activity. Nothing about the appearance of Defendant or her vehicle supports reasonable suspicion. If the circumstances of this stop were enough to constitute reasonable suspicion, "a very large category of presumably innocent travelers . . . would be subject to virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441 (1980). Because there was no reasonable suspicion for the stop, all evidence recovered as a result of it should be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

**I.   Standard for Stops by United States Border Patrol Agents**

Consistent with the Fourth Amendment's prohibition on unreasonable searches and seizures, Border Patrol agents on roving patrol may stop vehicles "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle's occupants are involved in criminal activity. *United States v. Cantu*, 97 F.3d 1118, 1120 (10th Cir. 1996). Reasonable suspicion "does not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "By imposing the reasonable suspicion standard, the Supreme Court sought to avoid subjecting residents of the

[border area] to potentially unlimited interference with use of the highways, solely at the discretion of Border Patrol officers." *United States v. Rodriguez-Rivas*, 151 F.3d 377, 380 (5th Cir. 1998).

When determining if a Border Patrol agent had reasonable suspicion to stop a vehicle in the border area, the Court considers "the totality of the circumstances" under which the stop occurred. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). In making its determination, the Court takes into account (1) the characteristics of the area where the agent encountered the vehicle; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the road; (4) the agent's previous experience with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including erratic driving or any obvious attempts to evade the agent; (7) aspects of the vehicle, such as a station wagon with concealed compartments; (8) the appearance that the vehicle is heavily loaded; and other relevant factors. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). "When evaluating an [agent's] decision to stop a vehicle, a court may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in isolation." *United States v. Cheromiah,* 455 F.3d 1216, 1221 (10th Cir. 2006). Rather, the "whole picture" should be taken into account. *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Unlike ordinary police officers, Border Patrol agents have limited jurisdiction. *Ortiz v. United States Border Patrol*, 39 F. Supp. 2d 1321, 1326 (D.N.M. 1999), *aff'd*, 210 F.3d 390 (10th Cir. 2000) ("Border Patrol agents are not general law enforcement officers. Instead . . . their authority and duties are circumscribed by statute and limited in scope. Their primary duties are to prevent illegal aliens from entering the country."). Border Patrol agents do not have

authority to stop a vehicle for a traffic violation alone.  *See United States v. Hernandez-Lopez,* 761 F. Supp. 2d 1172, 1199 (D.N.M. 2010) ("The Border Patrol has no jurisdiction to enforce the New Mexico traffic code."); *United States v. Rodriguez-Rivas*, 151 F.3d 377, 381 (5th Cir. 1998) ("the absence of Texas license plates alone does not authorize a Border Patrol agent to stop a vehicle"); *United States v. Gonzales-Calderon,* No. 05–CR–1369 BB, 2005 WL 6147579, at *3 n.1 (D.N.M. Sept. 16, 2005) (unpublished) ("The [Border Patrol agent]'s testimony that the van's speed was erratic and that the van made two lane changes is not relevant [to determining whether reasonable suspicion existed] as the Agent admitted he had no authority to stop the van for traffic violations.").

**II.     The agent did not have reasonable suspicion for the stop.**

Of the eight factors enumerated in *Brignoni-Ponce*, three require evaluation of the attributes of the individual driver and vehicle (e.g., the driver's behavior, including obvious attempts to evade officers; aspects of the vehicle, such as concealed compartments; the appearance that the vehicle is heavily loaded).  422 U.S. at 885.  The remaining five factors require the Court to consider features of the area where the stop took place and the knowledge of the agent who made the stop (e.g., the characteristics of the area in which the agent encountered the vehicle; the proximity of the area to the border; the usual patterns of traffic on the road; the agent's previous experience with alien traffic; information about recent illegal border crossings in the area).  *Id*.  In summary, three of the eight factors are unique to the driver and vehicle (the "individual factors"), while the other five are specific to the agent and location (the "environmental factors").

### a. Some of the environmental factors tend to support, but do not establish, reasonable suspicion.

Some of the environmental factors weigh in favor of reasonable suspicion. The stop occurred on New Mexico Highway 80, a road that crosses and then runs parallel to the New Mexico-Arizona border. [Doc. 30] at 2. Agent Morin testified that, based on his training and experience, he understood that smugglers frequently use Highway 80 to avoid fixed Border Patrol checkpoints in Arizona. Hrg. Tr. at 13:10–15.

The stop occurred about 50 miles north of the United States-Mexico border as the crow flies, or about 60 miles on the road. *Id*. at 13:2–8. Fifty miles is roughly the farthest a Border Patrol agent can be from the border and still use proximity to support reasonable suspicion. *Hernandez-Lopez,* 761 F. Supp. 2d at 1195 ("The Tenth Circuit has . . . [provided] a rough guide of fifty miles as being sufficiently close to support reasonable suspicion.").

Agent Morin had nine years of experience with the Border Patrol at the time of the stop. [Doc. 30] at 1. He testified that, in his experience, the usual traffic on Highway 80 at 4:00 a.m., if there is any, consists largely of semi-trailer trucks. *Id*. at 2; Hrg. Tr. at 14:9–13. The fact that Defendant was not driving a semi-trailer truck could be deemed to weigh in favor of reasonable suspicion.

Agent Morin believed that smugglers try to take advantage of what he described as a 4:00 a.m. "shift change" to avoid apprehension. [Doc. 30] at 2; Hrg. Tr. at 60:9–62:12. He testified that this is because there is "less coverage" between 4:00 and 7:00 a.m. *Id*. at 60:9–61:11. A shift change occurs when "agents begin heading back to the [station, leaving] the area unpatrolled." *Arvizu*, 534 U.S. at 269. The Court is skeptical that any kind of "shift change" occurs at or near 4:00 a.m., or that there is less coverage than usual at this time. In fact, it

8

appears that 4:00 a.m. is one of the few times during the day when agents are neither coming on nor going off duty. Hrg. Tr. at 105:13–106:2. If criminals are aware of the shift hours (which the logic of the argument presumes), they would know that. Thus, the Court gives little credence to the Government's argument based on this purported "shift change."

Consideration of these environmental factors establishes, at best, that Agent Morin was aware that smugglers sometimes pass through the area. However, these same factors would have applied to every driver who passed Agent Morin during his shift that night, with the possible exception of semi-trailer truck drivers. Reasonable suspicion cannot be built on the back of conditions that "describe a very large category of presumably innocent travelers." *Reid*, 448 U.S. at 441. Instead, the agent must have "a particularized and objective basis for suspecting the *particular* person stopped" of criminal activity. *Cortez*, 449 U.S. at 417–18 (emphasis added). These environmental factors, taken alone, do not establish reasonable suspicion.

### b. The individual factors do not support reasonable suspicion.

The three individual *Brignoni-Ponce* factors require the Court to evaluate attributes of the individual driver and vehicle (e.g., the driver's behavior, including obvious attempts to evade officers; aspects of vehicle, such as concealed compartments; the appearance that the vehicle is heavily loaded). 422 U.S. at 885. Agent Morin's observations of Defendant and her vehicle do not support reasonable suspicion.

#### i. The characteristics of Defendant's vehicle lend little, if any, support to reasonable suspicion.

Two of the *Brignoni-Ponce* factors direct the Court to consider characteristics of the vehicle. 422 U.S. at 885 (aspects of vehicle, such as concealed compartments; the appearance that the vehicle is heavily loaded). Courts have found the following vehicle characteristics

supportive of reasonable suspicion: the vehicle has the capacity to carry large amounts of contraband, it has tinted windows, *United States v. Quintana-Garcia*, 343 F.3d 1266, 1273 (10th Cir. 2003); it has crossed the international border recently, it is stolen, it is not registered, *Hernandez-Lopez*, 761 F. Supp. 2d at 1197; it contains concealed compartments or it appears to be heavily loaded, *United States v. Miranda-Enriquez*, 941 F.2d 1081, 1084 (10th Cir. 1991). Defendant's vehicle had none of these characteristics.

The Government asserts that three aspects of the vehicle support reasonable suspicion: its out-of-state plates; its registration in Mesa, Arizona; and the fact that it was an older-model sedan. As to the Arizona license plates and registration, Highway 80 crosses the New Mexico-Arizona border and then runs parallel to it. Defendant was only one mile from Arizona when she was stopped. *See* Government's Exh. 8 (map of boot heel region). Because of the proximity to the Arizona border, Defendant's Arizona plates are not particularly noteworthy.[4] *See United States v. Martinez-Cigarroa*, 44 F.3d 908, 911 (10th Cir. 1995) (internal citations omitted) ("While out-of-state license plates may be a relevant consideration in some circumstances . . . this factor in and of itself is not significantly probative of illegal activity and adds little to the reasonable suspicion equation.").

Second, the Government asserts that the Mesa, Arizona registration was suspicious because Agent Morin was aware that some smugglers originate in the "Mesa, Phoenix area." Hrg. Tr. at 18:24–19:10. Little weight can be given to the Mesa registration, however, as it would apply to "a very large category of presumably innocent travelers" from those cities. *Reid*, 448 U.S. at 441. Mesa is a large suburb of Phoenix with a population of over 460,000, while

---

[4] The Government conceded this in its Response. Government's Response [Doc. 30] at 12 ("The significance of Arizona license plates may be slightly diminished due to Rodeo's proximity to the Arizona state line.").

Phoenix itself has a population of over 1.5 million.  UNITED STATES CENSUS BUREAU, *QuickFacts*, http://www.census.gov/quickfacts/table/PST045215/00.  Agent Morin's observation regarding Defendant's Phoenix-area registration would apply to hundreds of thousands—if not millions—of vehicles.

Agent Morin also testified that he found the Mesa registration suspicious because he assumed that Defendant was coming from Douglas, Arizona, and was returning to Mesa.  In other words, he assumed that because the vehicle was registered in Mesa, the driver had to be travelling toward Mesa.  Agent Morin repeatedly insisted that, given those assumptions, taking Highway 80 to Interstate 10 would have added 100 miles to her trip.  But this would only be true if the point of origin and destination that Agent Morin assumed were actually correct, which he had no way of knowing at the time.  Hrg. Tr. at 19:24–20:18; 37:17–38:5.  Before he stopped her, he had no way of knowing where she was coming from or where she was going; he had no way to know whether his assumptions were correct.  The fact that Defendant's vehicle was registered in Mesa, Arizona simply does not support reasonable suspicion.

Defendant's vehicle was a 2002 Honda Civic.  Agent Morin testified that this raised his suspicion because he had recently apprehended individuals smuggling aliens in similar vehicles (i.e., older-model, four-door sedans).  [Doc. 30] at 3; Hrg. Tr. at 69:7–9.  However, it is large vehicles, not small sedans, that are commonly viewed as supportive of reasonable suspicion. *See, e.g.*, *Arvizu*, 534 U.S. at 270 (agent knew that minivans were often used by smugglers); *Cheromiah*, 455 F.3d at 1221 ("Vans are typically used to carry illegal aliens and conceal contraband."); *Quintana-Garcia*, 343 F.3d at 1373 (Chevrolet Suburban SUVs often used by smugglers because they can hold many people); *Hernandez-Lopez*, 761 F. Supp. 2d at 1197

11

(Government conceded that Dodge sedans are not the type of vehicles frequently used by smugglers because of their size and the size of their gas tank). While the agent is certainly entitled to use his training and experience to assess the vehicle's appearance, *Brignoni-Ponce*, 422 U.S. at 855, the Government has provided no additional support for the position that "older-model sedans" are vehicles of choice for smugglers. Agent Morin's assertion that he recently caught two sedans carrying illegal aliens is unpersuasive. Hrg. Tr. at 69:7–9. The appearance of Defendant's vehicle does not support reasonable suspicion.

### ii. Defendant's behavior does not support reasonable suspicion.

The sixth *Brignoni-Ponce* factor directs the Court to consider the driver's behavior. 422 U.S. at 885. Defendant did none of the things commonly seen as supporting reasonable suspicion of illegal activity. *See, e.g.*, *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1147 (10th Cir. 2006) ("Defendant appeared to stop his truck, reverse direction, and move away from the agent's vehicle in an abrupt and erratic manner even though the agent had not yet blocked his path or made any show of official authority."); *Cheromiah*, 455 F.3d at 1218 (driver stiffened up upon seeing agent and one of the backseat passengers "dove down" after seeing the agent); *Quintana-Garcia*, 343 F.3d at 1273 (Defendant slowed Suburban from 75 mph to 45 mph and pulled to the right side of the road before agent activated lights, then continued to drive for one to two minutes after the lights were activated, suggesting the possibility of a passenger bailout).

There are three aspects of Defendant's behavior that the Government viewed as supportive of Agent Morin's decision to stop her for an immigration inspection: (1) she appeared "rigid" and did not turn her head to look at the agent as she passed him, [Doc. 30] at 2; (2) she repeatedly checked her rearview mirror after the agent began to follow her; and (3) she swerved

12

to the left several times approximately 10–14 minutes after he began following her, *id*. at 4.  The Court is not persuaded that any of this behavior supports reasonable suspicion that Defendant was committing an immigration violation, which is the specific reason given for the stop. [Doc. 30] at 4 ("Agent Morin decided to conduct an immigration inspection of the driver of the vehicle.").

First, the evidence does not support the Government's contention that Defendant appeared rigid and did not look at the agent as she drove past him.  Agent Morin admitted that he could not observe Defendant's demeanor as she passed his vehicle. Hrg. Tr. at 17:1–5.  In fact, he explicitly repudiated the Government's contention. *Id*. at 44:3–14.  However, even assuming that he *could* have seen her in the dark, and even assuming that she had appeared "rigid," it would make no difference to the Court's analysis, because those observations would not support reasonable suspicion. *See United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993) (after Government asserted that Defendant was "gripping the wheel tightly and looking straight ahead at the road," the Court stated that it "[failed] to see the nexus between careful driving and illegal conduct"); *United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992) (observing that "passengers merely avoiding eye contact" is behavior that can be interpreted as innocent, unlike passengers diving down when they see an agent).  Defendant could have failed to notice that the agent was in a marked Border Patrol vehicle.  Or she might have simply decided to keep her eyes on the road.  Her decision to keep a proper lookout would not indicate that she was committing an immigration violation.

Second, the fact that Defendant repeatedly checked her rearview mirror after the agents began following her does not weigh in favor of reasonable suspicion.  Preliminarily, the Court

13

finds it difficult to believe that Agent Morin could see Defendant looking in her rearview mirror. There were no street lights, nor any other nearby sources of light. Agent Morin testified that the "reflectors" on the curves in the road allowed him to see Defendant look in the mirror. Hrg. Tr. at 22:8–11; 65:24–66:7. He conceded that these reflectors appeared only at curves in the road. Further, he conceded that he could not observe Defendant's actions inside the vehicle without the benefit of the reflectors. *Id*. at 65:3–7. The Court is skeptical of that testimony. It is not at all clear that Agent Morin could have known if Defendant was "constantly" checking her mirror, as he could, at best, only see inside the car when there were reflectors on the side of the road.

If the agent was, in fact, following four car-lengths behind Defendant as he testified, it would have been nearly impossible for him to see if Defendant was looking in her rearview mirror. *Id*. at 64:25–65:2. Alternatively, if he was close enough to see Defendant checking her rearview mirror in the dark, it would not be surprising for her to keep an eye on a vehicle that was following her so closely on a dark road in the middle of the night.

But even if the Court were to accept Agent Morin's testimony that he could see Defendant looking repeatedly in her rearview mirror, it would add little support for reasonable suspicion of illegal activity. Agents Morin and Gaylord followed her for roughly 10–14 miles on an isolated road, early in the morning. Under those circumstances, it would not be surprising for her to be distracted by the agents' presence. *United States v. Jones*, 149 F.3d 364, 370 (5th Cir. 1998) ("When the [agent's] actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed. In this case, the fact that [Defendant] continually glanced back at [the border patrol agent] in his rear-view mirror and subsequently drifted off the road-way does not

give rise to reasonable suspicion."). Indeed, it would be surprising for a woman, driving alone, at night, on a deserted road in the middle of nowhere, not to be concerned about two vehicles following her for an extended period.

Third, the fact that Defendant began to swerve in her lane approximately 10–14 minutes after Agents Morin and Gaylord began following her does not support reasonable suspicion. Hrg. Tr. at 22:7–11. "It is perfectly understandable that swerving within one's own lane of traffic would not support reasonable suspicion of smuggling, which has nothing to do with impairment, but would support reasonable suspicion that the driver was impaired." *United States v. Palos-Marquez,* 591 F.3d 1272, 1278 (9th Cir. 2010) (internal citations omitted). While swerving might be a legitimate reason for a general law enforcement officer to stop a driver, it does not support reasonable suspicion for the agent's stated reason for stopping Defendant, i.e., an immigration inspection. There is no evidence that Defendant swerved so violently that she crossed the yellow line on the left or the white line on the right, or that she accelerated or decelerated, or that her driving was otherwise unusual.

The Government has failed to show how Defendant's alleged behavior supports reasonable suspicion of an immigration violation. Defendant's repeated checking of her rearview mirror reflects nothing more than careful driving. While Defendant's swerving might have provided a general law enforcement officer with reasonable suspicion of a *traffic* violation, e.g., driving while intoxicated, the Court rejects the Government's argument that such behavior provided reasonable suspicion of an *immigration* violation. Defendant's behavior does not support reasonable suspicion for the stop.

### c. Considering the totality of the circumstances, the Court finds that there was no reasonable suspicion for the stop.

To determine whether reasonable suspicion existed for a stop, the Court must take into account "the totality of the circumstances—the whole picture." *Cortez*, 449 U.S. at 417. Here, Agent Morin was observing a section of Highway 80 about 50 miles from the U.S.-Mexico border, and one mile from the Arizona border, at approximately 4:00 a.m. He was aware that Highway 80 was often used by smugglers, and that the traffic at that early hour consisted mainly of semi-trailer trucks. He had apprehended one or two individuals driving older-model sedans carrying illegal aliens in the previous weeks. He saw Defendant pass in a 2002 Honda Civic, travelling at the speed limit, and noticed only a female silhouette. Agent Morin did not recognize the car as belonging to a local resident, and decided to follow her while calling in a records check. The records check revealed that the car was registered to a woman in Mesa, Arizona, was not stolen, and had not recently crossed the U.S.-Mexico border. The agent followed her for over ten miles, during which time she looked in her rearview mirror repeatedly and continued to travel at the speed limit. Eventually, Defendant swerved to the left a few times. Based on these facts, Agent Morin decided to pull her over for an "immigration inspection." The Court is mindful that some of these facts could indeed weigh in favor of reasonable suspicion. However, when the Court looks at the complete picture of the events in the early morning of August 30, 2015—when it considers the totality of the circumstances—they do not add up to reasonable suspicion of an immigration violation.

The factors that could support the stop of Defendant would support the stop of *any* vehicle that night. That is, they are environmental factors that "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures" if those

16

factors alone were enough.  *Reid*, 448 U.S. at 441.  The Government has not presented sufficient facts to show reasonable suspicion to stop this *particular* lone driver in this *particular* vehicle for a suspected immigration violation.  The Court has been unable to find support for the proposition that environmental factors alone, without more, can support a Border Patrol agent's stop of a vehicle for an immigration inspection.

Given the Government's argument, the Court is hard-pressed to think of a vehicle that would not arouse reasonable suspicion.  Would only a semi-trailer truck with New Mexico plates whose driver never looked in his or her rearview mirror and appeared totally calm be able to pass by without being stopped?  While the Court appreciates the difficult mission of the Border Patrol, in this case, it has cast too wide a net.  "Reasonable suspicion must be founded upon a particularized and objective basis for suspecting the *particular person* stopped of criminal activity.  For this reason we must not accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch."  *United States v. Rodriguez*, 976 F.2d 592, 595–96 (9th Cir. 1992).  After considering the totality of the circumstances, the Court finds that the agent did not have reasonable suspicion to stop Defendant for an immigration inspection, and the stop violated the Fourth Amendment.  All evidence recovered as a result of the stop should be suppressed.

## CONCLUSIONS AND RECOMMENDED DISPOSITION

For the reasons set forth herein, I respectfully recommend that Defendant's Motion to Suppress [Doc. 22] be **GRANTED**, and all evidence obtained from the stop be suppressed.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**